**Entered on Docket**
**September 30, 2013**
**GLORIA L. FRANKLIN, CLERK**
**U.S BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



1

2      **IT IS SO ORDERED.**
3      **Signed September 30, 2013**

4

5

6      *Arthur S. Weissbrodt*
       _____
       **Arthur S. Weissbrodt**
7      **U.S. Bankruptcy**

8
               UNITED STATES BANKRUPTCY COURT
9
             NORTHERN DISTRICT OF CALIFORNIA
10

11
    In re HARBANS S. GREWAL and        Case No. 10-60800
12  MANJIT KAUR GREWAL,
                                       Chapter 7
13           Debtors.

14  _____

15  HARBANS and MANJIT GREWAL,         Adversary No. 11-5067

16           Plaintiffs,

17  vs.

18  SANTA CRUZ COUNTY BANK, AND
    DOES 1-10,
19
             Defendants.
20  _____

21       **MEMORANDUM DECISION AND ORDER FOLLOWING TRIAL**

22       This matter came before the Court for a trial on claims

23  asserted by Plaintiffs Harbans and Manjit Grewal ("the Grewals")[1]

24  against Defendant, Santa Cruz County Bank ("SCCB").  The Grewals

25  were represented by attorney William Healy, and SCCB was

26  _____

27       [1] Collectively, the Court will refer to both Plaintiffs as
    "the Grewals."  Individually, Harbans Grewal is referred to as "Mr.
28  Grewal."

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   represented by attorney William Thomas Lewis.

2       At trial, each side called witnesses to testify. The Grewals

3   testified on their own behalf.  Debra Crawford, Rich Dunham, Jorge

4   Reguerin, and Susan Chandler testified on behalf of SCCB.  The

5   testimony of Jayant Trivedi was entered by deposition.

6       After considering the parties' evidence and arguments of

7   counsel, the Court finds and concludes that SCCB's post-petition

8   possession of the refrigerator and water cooler violated the stay

9   (and possibly also the discharge injunction), but no other

10  violation of the stay or discharge injunction was proven.

11      This Memorandum Decision constitutes the Court's findings of

12  fact and conclusions of law, pursuant to Rule 7052 of the Federal

13  Rules of Bankruptcy Procedure.

14

15                          **I. SUMMARY**

16      Facing a balloon payment Mr. Grewal could not afford, Mr.

17  Grewal successfully refinanced Mr. Grewal's loan on a gas and

18  service station located in Gilroy, California with SCCB in August

19  of 2007.  SCCB placed liens against both the real property and

20  against the business, Mr. Grewal's wholly owned corporation, All

21  American Gas and Auto, Inc. (hereafter, "All American"), as

22  collateral for this loan.

23      On September 29, 2010, SCCB foreclosed, and changed the

24  business' locks.  The Grewals filed a personal bankruptcy petition

25  on October 18, 2010.  At that time, certain property, including a

26  smog machine, was located inside the business.  The Grewals now

27  contend that the property left inside the business was the personal

28  property of Mr. Grewal, not the property of All American, and that

2

SCCB's failure and/or refusal to return that property to Mr. Grewal violated the automatic stay and discharge injunction, 11 U.S.C. §§ 362 and 524. SCCB contends the property belonged to All American, not Mr. Grewal, and that SCCB received insufficient notice of what property was included in the bankruptcy case due to the schedules filed by the Grewals.

The issue for this Court to determine is whether SCCB committed a violation of the automatic stay (11 U.S.C. § 362) or of the discharge injunction (11 U.S.C. § 524).

## II. FINDINGS OF FACT

### A. Mr. Grewal and Grewal Shell

In May 2000, Mr. Grewal purchased Ellis & Larry's Shell, a gas station business, located at 8395 Monterey Street in Gilroy, California, from Larry Nardinochhi for $155,000. Mr. Grewal began to do business at that location as "Grewal Shell." The building consisted of a gas station, store, and service bay for doing automotive work. As part of the purchase, Mr. Grewal also took possession of the business' equipment, fixtures, and inventory, including an old smog machine. At the time, it was Mr. Grewal's intention to take what Mr. Grewal perceived to be a troubled business, turn it around, and then sell the business so that Mr. Grewal could finance the purchase of a separate business closer to Mr. Grewal's home in Milpitas, California.

In 2003, Mr. Grewal replaced the old smog machine that was purchased with the business with a new smog machine. The old smog machine was donated to a mechanic's school in 2003, and Mr. Grewal leased a new smog machine from BWC Equipment Leasing. The new smog

3

machine consisted of three components: a dynamometer, cooling fan, and computer unit. The dynamometer was a large device that sat in a concrete bay in the ground, where a car could park its tires on top of it. The dynamometer was not attached or bolted to the structure. The cooling fan and computer unit were separate devices, and could be moved around. This lease included a $1 buyout provision upon completion of the lease payments; it is unclear from the evidence whether or when the buyout occurred, or under what circumstances it could occur in the future.[2]

**B.    Formation of All American and Purchase of Real Property**

In 2004, Shell Corporation contacted Mr. Grewal and informed him that Shell would be closing the gas station, and Mr. Grewal could either purchase the real property for $1,000,000 or leave. Mr. Grewal was given 45 days to decide. Grewal Shell had not posted a profit since 2002. Mr. Grewal decided to purchase the gas station, including the associated real property, and formed a corporation, All American, in March 2004 to effectuate the purchase. In order to finance the purchase, Mr. Grewal obtained a hard money loan from Coast Capital. Escrow closed in June 2004.

Mr. Grewal testified that in forming All American, it was Mr. Grewal's intent to use All American as a real estate holding company. In this regard, Mr. Grewal intended that All American

_____

[2] The lease documents for the smog machine -- including the $1.00 buyout letter -- were mentioned in a letter dated June 4, 2003 from BWC Equipment Leasing to Mr. Grewal (See Exhibit No. 16), but not all of the lease documents were attached to the letter. According to the Addendum to Lease (Exhibit No. 16), Mr. Grewal had the option of purchasing the smog machine for $1.00 after making all lease payments. The date of the final lease payment was not specified. The purchase order for the smog machine is Exhibit Q, but the purchase order was also silent as to the lease's terms.

4

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

would hold the real estate as well as the equipment needed for the gas station, such as the underground tanks and pumps. According to Mr. Grewal, he intended that the smog check and mechanic's businesses would remain separate.

Upon formation of All American, Mr. Grewal transferred a number of assets to the corporation. Mr. Grewal's accountant, Jayant Trivedi, via deposition entered into evidence, testified that it was Mr. Trivedi's understanding that all assets of Grewal Shell were transferred to All American. According to Mr. Trivedi, it would have been Mr. Trivedi's practice to ask Mr. Grewal if any assets were not to be transferred to All American.

From the formation of All American through its demise in 2010, All American maintained insurance on the business and equipment in All American's name. No separate policy was created to cover a different business operating at that location; the only policies offered into evidence were the old policy for Grewal Shell, then the new policies for All American. Mr. Grewal testified that Mr. Grewal believed that because Mr. Grewal was a mechanic, Mr. Grewal's personal property was covered under the insurance agreement. However, the policies were business policies -- renewed from year to year -- which only provided coverage to All American for its building and "business personal property." Mr. Grewal was not a named insured or an additional insured. There was no expert testimony as to whether Mr. Grewal's personal property was covered under the insurance agreement.

All American also filed 571-L Business Property Statements with the County of Santa Clara from inception to termination; no other Business Property Statements were filed by Mr. Grewal for any

5

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

other business entity.  SCCB's witness, Rick Dunham, CPA, testified based on Mr. Grewal's tax filings since 2002 (filings prior to 2002 were not available), that the entirety of the business purchased in 2000 from Larry and Ellis Shell by Grewal Shell was transferred to All American in 2004.  Mr. Dunham further testified that a review of All American's tax filings from 2004 through 2010 evidenced no disbursement of assets from the corporation.  The form and scope of the business, which were not defined, were not discussed by Mr. Dunham.

Mr. Grewal's personal tax returns from 2002 through 2010, and the tax returns for All American, from 2004 through 2010, were entered into evidence.

After the purchase from Shell Corp., All American began operating the business as Gilroy Gas and Auto.  Mr. Grewal testified that after the formation of All American, All American made all the lease payments on the smog machine.  Mr. Grewal testified that this was because Mr. Grewal's bank account for Mr. Grewal's sole proprietorship[3] was closed and Mr. Grewal was not doing business, and All American was using the smog machine to generate revenue for the business.  Mr. Grewal testified that clients were billed after incorporation as "Gilroy Gas and Auto Service," and when the dba changed in 2007, clients were billed under "Gilroy VP Racing."

Mr. Grewal further testified that after incorporation, the business continued to sell gas, operate a store, and perform

_____

[3] It was not clear from Mr. Grewal's testimony what the name of the sole proprietorship was.

6

automotive repairs, including brake and smog inspections.  On July 11, 2007, Gilroy Gas and Auto purchased an EVAP[4] unit, which due to a change in state law was required in order to continue operating the smog business.  Mr. Grewal testified that the EVAP was purchased in All American's name because the EVAP machine was sold only to businesses with a license for smog inspections.  However, the parties stipulated that Mr. Johnson, a person knowledgeable with the bureau of automotive affairs, would testify that "there is no licensing requirement, by the bureau, for anybody who purchases an EVAP machine or smog equipment; there is only a licensing requirement for one to -- for a location for one to conduct a smog inspection and repair business, and a licensing requirement for a service tech that would actually do the physical smog inspection and repair work.  But the mere ownership of an EVAP machine and a smog machine does not trigger any sort of licensing requirement."  Mr. Grewal, when recalled to the stand, testified that Mr. Grewal meant that because All American had a license to perform smog checks, and was performing smog checks, the EVAP machine was bought in All American's name.

**C.    SCCB's Loan**

By 2007, Mr. Grewal's business had still not shown a profit since 2002, and a balloon payment on the loan from Coast Capital

---

[4] Mr. Grewal testified that an EVAP unit is a separate device from the smog machine apparatus that measures the gasoline in a vehicle's gas tank during the smog check.  While not a part of the smog machine apparatus, the EVAP unit is legally necessary to perform smog certifications.  The testimony in this regard was not entirely clear, but it may mean that prior to 2007, smog certifications could be performed without the use of an EVAP machine.

7

1    was about to come due in August 2007.  Mr. Grewal was not able to

2    make that payment, and without refinancing, expected to be

3    foreclosed upon.  Mr. Grewal contacted a number of lenders to

4    obtain a loan to refinance, but was rejected.

5         Mr. Grewal was put in touch with Jorge Reguerin, an employee

6    at Heritage Bank, regarding the refinancing.  Because of the

7    looming payment, in June 2007, Mr. Grewal and Mr. Reguerin met at

8    the Cupertino Post Office, where Mr. Reguerin explained the SBA 7A

9    program, discussing the terms, details, and what collateral would

10   be required.  At some point, Mr. Reguerin visited the gas station.

11   During this process, Mr. Reguerin left Heritage Bank and began

12   working for SCCB.

13        According to Mr. Grewal, Mr. Grewal told Mr. Reguerin that

14   because the business had no income,[5]  the loan would have to be

15   based on the value of the real property.  Later, on cross-

16   examination, Mr. Grewal testified that Mr. Grewal told Mr. Reguerin

17   that: (1) Mr. Grewal owned "the shop business as Grewal Shell and

18   that's the part I owned previously even before the real estate";

19   and (2) Mr. Grewal had an ownership interest in assets at the

20   gasoline station.  However, Mr. Grewal admitted that Mr. Grewal did

21   not specifically tell Mr. Reguerin or SCCB that Mr. Grewal owned

22   assets individually which Mr. Grewal was not pledging for the loan.

23        SCCB approved the refinance for Mr. Grewal.  Even though it

24   was All American which owned the real estate, Mr. Grewal guaranteed

25   the loan.  In July 2007, Mr. Grewal received a letter from SCCB

26   _____

27        [5] Although Mr. Grewal testified that the business had no
     "income," the Court interprets this to mean that the business was
28   not making a profit.

8

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

stating that as collateral for the loan, there would be a first deed of trust recorded on the real property, and a "UCC-1 filing on business." Mr. Grewal testified that at the time Mr. Grewal got the loan from SCCB the business was "shut down for the gas part."[6]

The business loan agreement between Mr. Grewal and SCCB -- which was secured by the real estate and the UCC-1 filing -- required any notices by Mr. Grewal to SCCB to be given in writing, and directed to the address at the beginning of the agreement -- Santa Cruz County Bank, Santa Cruz Office, 325 Soquel Ave, Santa Cruz, CA 95062. The UCC-1 filing -- which SCCB recorded with the Santa Clara County Recorder on August 20, 2007 (Exhibit AY) -- specified that SCCB's security interest extended to the following collateral: "All Fixtures, Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Fixtures[.]"

Gilroy Gas and Auto continued to struggle. In November 2007, Gilroy Gas and Auto changed its name to "Gilroy VP Racing," and began selling 100-octane high performance gasoline to attract customers.[7]

**D.   Mr. Grewal's Attempt to Sell the Business**

Mr. Grewal testified that in 2010, in an attempt to sell the entire business, Mr. Grewal contacted Business Team, an organization that had previously helped Mr. Grewal in the purchase of the gas station. Mr. Grewal testified that Mr. Grewal informed

---

[6] The evidence concerning when Gilroy Gas and Auto sold gasoline and the octane level of the gasoline was not crystalline.

[7] It was unclear from the evidence whether, at this juncture, Gilroy VP Racing only sold high octane gasoline, or whether the business sold a wide range of gasoline products.

9

Business Team that All American was the owner of the real property and gas station, and the mechanic's business and its equipment were Mr. Grewal's personal property. However, his testimony was not supported by any other evidence as to the separate nature of the mechanic's business and equipment.

Business Team located a willing buyer. The offer, submitted to SCCB, listed the seller as "All American Gas & Auto, Inc" and was signed by Mr. Grewal, dated September 4, 2010. (Exhibit DU). Mr. Grewal's initials appeared on each page. Each page of the agreement is initialed by Mr. Grewal. The agreement provided for certain items to be excluded from sale, listing that "auto mechanic employee has own tools." However, Mr. Grewal testified that as part of the sale, Mr. Grewal intended to sell Mr. Grewal's personal property to the buyers, including the smog machine. According to Mr. Grewal, there would be a split escrow; All American was to transfer the real property to the buyers, and Mr. Grewal was to transfer Mr. Grewal's personal property to the buyers. The document (Exhibit DU) appears to be for a sale between All American and a buyer, but there is no evidence in the sale agreement of the Grewals possessing or selling any personal property. Mr. Grewal testified that Mr. Grewal objected to the document listing the seller as All American and not Mr. Grewal, and that Mr. Grewal signed as an individual, not as All American's representative, contrary to what appeared on the document. Mr. Grewal testified that after the submission of the agreement, the agreement was to be amended to reflect Mr. Grewal's individual capacity; however, due to the need to move quickly, there was not time to change the document prior to signing and initialing. However, multiple pages

10

contained handwritten edits and interlineations, which indicates that there was sufficient time to make handwritten amendments to clarify that Mr. Grewal was signing in an individual capacity, if that had been his intent.

The agreement was presented by Mr. Grewal's agent to SCCB with the request to approve. Mr. Grewal testifed that because SCCB's loan was already in foreclosure, SCCB's approval of the sale was necessary. SCCB did not approve the sale.

**E.  Mr. Grewal's Bankruptcy and Post-Petition Events**

About August of 2010, SCCB's employee, Debra Crawford, noticed that the gas station appeared empty and no longer operating. On September 29, 2010, SCCB foreclosed on its lien, and that same day, had the locks changed. Inside the building were a number of items, including the smog machine, some items related to car repair, as well as tools and equipment belonging to Mr. Grewal's employee, Roberto Martinez. Mr. Grewal testified that around this time the business had ceased operation, but Mr. Grewal continued to use the building for personal projects.

Mr. Grewal's counsel contacted Debra Crawford via letter around October 3, 2010, seeking to take possession of some property, stating that property was property of Mr. Grewal, not All American. The list (hereafter, "the October 3, 2010 List") contained: a 1993 BMW 740il; BMW engine; BMW rims; Mercedez Benz rims; a water cooler; a small refrigerator; a blue air hose; a black box with tools inside; a cardboard box with tools inside; a grey box holding air conditioning hoses; gauges; jumper cables; a plastic bag with clothes; a floor jack and jack stands; a motorcycle and parts; funnels; two radios; a red craftsman creeper;

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

a fluid evacuation pump; a long arm glow auto opening tool; a grey box soldering gun kit; an acetylene welding and cutting kit; a black oil drain pipe; a multipurpose drain pan; bazooka speakers; a military metal box with tools inside; two work lights; a yellow extension cord; a Snap-On box with shoes; a plastic bag with transmission oil; a Craftsman blower; a Napa cardboard box with pullers inside; a UPS box with a car computer inside; plastic and glass jars; and a red vise. Notably, the letter did not mention the smog machine or its components. A letter sent on October 12, 2010, reiterated the request, and offered SCCB a release if in addition to the above-listed-items, SCCB released a grinder, the smog machine, personal clothing, books, and a desktop computer.

On or about October 8, 2010, Mr. Grewal's former employee, Roberto Martinez, claimed and recovered a number of items on the October 3, 2010 List. During that same visit, Mr. Martinez rolled the BMW 740il out of the garage. Mr. Martinez initialed the October 3, 2010 List, and signed a note stating Mr. Martinez had claimed and taken the marked items. The items taken mostly consisted of the tools on the October 3, 2010 List.

On October 18, 2010, the Grewals filed for bankruptcy. The Grewals' Schedule B, filed October 18, 2010, lists "Automotive equipment including wheel balancer and smog machine," stating a value of $5,600. That same schedule contained a duplicate of that page, listing "Automotive equipment including wheel balancer and smog machine," but stating a value of $4,000. On examination, Mr. Grewal could not explain the difference in values. Mr. Grewal testified that in August 2010, there were private sellers of smog machines on the market, priced from $18,000 and up. However, Mr.

12

Grewal testified that the smog machine at issue needed repairs costing between $2,600 and $3,200. The Grewals' Schedule C listed mechanical equipment worth $4,000, along with $4,000 in exemptions. Notice of the Grewals' Chapter 7 filing was sent to SCCB at P.O. Box 8426, Santa Cruz, California 95061 -- but not to SCCB's address stated in the business loan agreement.[8] The notice specified the deadline of January 18, 2011, to file a complaint to deny a discharge to the Grewals or to determine the dischargeability of debts.

On November 4, 2010, the Grewals' counsel sent another letter to Ms. Crawford at SCCB. The letter stated that it was memorializing a previous phone conversation, where Ms. Crawford was informed of the Grewals' Chapter 7 filing. Ms. Crawford could not recall the telephone conversation, but could not deny its occurrence. Ms. Crawford testified that Ms. Crawford saw -- on or about November 4, 2010 -- a letter from the Grewals' counsel to SCCB dated November 4, 2010; that letter clearly stated that Mr. Grewal had filed for Chapter 7 bankruptcy on October 18, 2010, and included the case number. Ms. Crawford further testified Ms. Crawford had seen -- on or about December 16, 2010 -- another letter sent from the Grewals' attorney to SCCB, which clearly referenced Mr. Grewal's status as a Chapter 7 debtor, including a case number.

On November 10, 2010, Ms. Crawford met with Mr. Grewal, Mr.

---

[8] SCCB contended that it did not receive timely notice of the Grewals' bankruptcy case, and complained that the notice was not sent to the proper address. As discussed infra, the evidence shows that SCCB had timely notice of the bankruptcy.

13

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Grewal's son, Gurgas Grewal ("Gurgas"), and Roberto Martinez at the gas station. Gurgas, Mr. Grewal, and Ms. Crawford all testified regarding the events which occurred during that meeting, but their testimonies differed substantially.

Mr. Grewal testified that Mr. Grewal borrowed a truck to help clear out the gas station, and drove to Gilroy. Upon arriving at the gas station, Mr. Grewal encountered Ms. Crawford, who gave Mr. Grewal a waiver of liability and hold harmless agreement and told Mr. Grewal that Mr. Grewal must sign it before Mr. Grewal could take any equipment. Mr. Grewal testified Mr. Grewal was surprised and that Mr. Grewal did not fully understand the agreement or feel comfortable signing it. Mr. Grewal thought that if Mr. Grewal signed the paper, Mr. Grewal would not be able to come back and retrieve more items on a subsequent trip for items Mr. Grewal could not carry that day. Mr. Grewal testified that Mr. Grewal told Ms. Crawford that Mr. Grewal could not move the tire machine or dynamometer on that day. According to Mr. Grewal, Ms. Crawford responded that Mr. Grewal could return later for those items, but could take the rest of the items if Mr. Grewal would sign the waiver first. Mr. Grewal testified that according to the paper provided by Ms. Crawford, Mr. Grewal could not return for anything which Mr. Grewal left at the gas station. Mr. Grewal photographed and sent a copy of the agreement to Mr. Grewal's attorney and Ms. Crawford spoke with the Bank.[9] Ms. Crawford then exited the

---

[9] However, the photo of the agreement which Mr. Grewal stated that he sent to his attorney was not offered into evidence. Instead, Mr. Grewal offered a personal injury waiver (Exhibit No. 9) entitled "Waiver of Liability and Hold Harmless Agreement" and

(continued...)

14

building, locked the door, and left without saying anything to Mr. Grewal.

Gurgas' testimony was somewhat different from the testimony of Mr. Grewal. Gurgas testified that Gurgas, Mr. Grewal, and Roberto Martinez attempted to collect the items. The three of them met Ms. Crawford at the gas station. Gurgas testified that when Ms. Crawford presented Mr. Grewal with a paper to sign, Mr. Grewal refused to sign because the paper was incomplete. According to Gurgas, Mr. Grewal told Ms. Crawford: "If I can't have the dyno, I don't want anything." Gurgas testified that Ms. Crawford claimed the dynamometer was a fixture, and Mr. Grewal, Gurgas, and Ms. Crawford entered the garage to inspect the dynamometer. Gurgas testified that throughout the encounter, Mr. Grewal was extremely calm and relaxed, while Ms. Crawford became upset and angry when Mr. Grewal refused to sign the paper. After speaking on the phone, Ms. Crawford locked the building door and left the location without speaking to Gurgas or Mr. Grewal. Gurgas testified that no items were collected, and the three of them left the location without taking any personal items from the location.

Ms. Crawford's testimony about the November 10, 2010, meeting was quite different from the testimony of Mr. Grewal and Gurgas.

_____

[9](...continued)
identified the waiver as the agreement which Ms. Crawford had provided to him. This waiver stated that Mr. Grewal would waive claims against SCCB "arising out of or relating to any loss, damage or injury, including death, that may be sustained by [Mr. Grewal], or to any property belonging to [Mr. Grewal], whether caused by the negligence [of SCCB]" while Mr. Grewal removed any personal property from the real property. This waiver did not preclude Mr. Grewal from returning to the real property to retrieve additional items of personal property in the future.

15

The Court did not find Ms. Crawford's testimony regarding the meeting to be particularly credible; despite Ms. Crawford's testimony that Ms. Crawford had seen the November 4, 2010 letter from the Grewals' counsel regarding the bankruptcy filing, Ms. Crawford -- who was employed by SCCB in loan administration -- claimed to have had no knowledge of the Grewals' bankruptcy at the time of the meeting.

According to Ms. Crawford's testimony, when Mr. Grewal arrived at the meeting, Mr. Grewal had two men with him to help. Mr. Grewal wanted to remove the dynamometer, but Ms. Crawford was unsure if Mr. Grewal could take it because it might be a fixture. Ms. Crawford testified that Mr. Grewal got mad and began to scream and yell at Ms. Crawford. Ms. Crawford testified that other than the dynamometer, Ms. Crawford permitted Mr. Grewal to take everything else, and Mr. Grewal left in a truck filled with items. Ms. Crawford testified that Mr. Grewal did not indicate that Mr. Grewal wished to return for a second load.

No parties took pictures or made an inventory or accounting of what assets were present or taken during the visit. On this issue, no specific evidence was introduced. There were no subsequent attempts by the parties to return or claim any assets.

**F.   Mr. Grewal's Subsequent Business Venture**

After All American ceased its business operations, Mr. Grewal opened a new business, "Ameek Auto," in Santa Clara. The location was leased for three years, and had between five and seven service bays. Ameek Auto was solely an auto-repair location, and Mr. Grewal intended to perform smog and brake lamp inspections as well. Mr. Grewal testified that the smog services were a driver for

16

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

business for the rest of Mr. Grewals' enterprise -- a way to get people in the door. Ameek Auto did not have a smog machine, and Mr. Grewal testified that Mr. Grewal was unable to finance one. After six months, Ameek Auto closed because it was unable to generate enough income to pay its bills.

### G. Items Mentioned in the Amended Complaint

In the Amended Complaint, the Grewals have alleged that SCCB violated both the automatic stay and the discharge injunction. The Grewals also have alleged that Mr. Grewal stored a number of individually-owned items at the gas station, which were used as part of All American's car repair business. Such items were listed in the Amended Complaint, as follows: a 1993 gold BMW 740il; BMW engine on rollers; BMW rims with old tires; MBZ rims with old tires; a water cooler; a small refrigerator; a dynamometer (in ground); an evaporator machine (EVAP) next to smog machine; a big cooling fan; "miscellaneous parts;" parts cleaner (blue box); "used black hoses @ nozzles (on shelf);" a grinder; personal clothing and blue towels; books; a desktop computer; an engine scope; a smog machine; a grease dispenser; oil; a mop bucket; "o-rings & quarter pins;" drain pans; a parts cart; a battery water container; and funnels. The parties stipulated that the BMW 740il, used black hoses with nozzles, and EVAP machine were not at issue in this case.[10]

At trial, Mr. Grewal testified that the value of the BMW engine listed in the Amended Complaint was probably $200. Mr.

---

[10] At the start of trial, the Grewals stipulated the EVAP machine was property of All American.

17

Grewal testified that the Grewals' Schedule B, item number 29, which listed "Automotive equipment including wheel balancer and smog machine," included the BMW rims and tires, and the MBZ rims and tires. However, during his deposition, Mr. Grewal testified that the MBZ rims did not appear on Schedule B. Mr. Grewal further testified that the water cooler and small refrigerator were not listed on the Grewals' schedule B, but were subsumed within the $4,000 category of line number 29. Mr. Grewal testified that both the small refrigerator and water cooler were brought from home for Mr. Grewal's personal use.

Mr. Grewal testified that Mr. Grewal claimed no interest in the building at 8385 Monterey in Gilroy, where the business was located. When asked whether Mr. Grewal had a lease, in Mr. Grewal's personal capacity, from All American for the mechanic's business, Mr. Grewal testified: "I was not running a separate business; I was running, under All American, All American had a shop, I was working there full time as [an] employee, or you can call it owner, whatever you say it -- but I was president of the company, I was running both sides of the business."[11]

**H.    Disposition of the Bankruptcy Case**

On November 25, 2010, Chapter 7 Trustee Mohamed Poonja entered a report of no distribution, stating that the Grewals' estate had been fully administered, and abandoned $29,739.00 worth of assets. This dollar amount appears to be derived from the Grewals' Schedule

---

[11] Mr. Grewal vacillated between two theories of ownership during his testimony -- that Mr. Grewal operated a separate business on the land owned by All American, and that Mr. Grewal was effectively an employee of All American and owned Mr. Grewal's tools in that capacity.

18

B, which stated that the total value of the Grewals' personal property was $29,730.00.  The Grewals received a Chapter 7 discharge on January 19, 2011.

### I.   Current Status of the Assets

On April 26, 2011, the Court issued a preliminary injunction restraining SCCB from selling personal property stored at the gas station.  The preliminary injunction covered the following items: a 1993 gold BMW 740il; a BMW engine on rollers; a BMW rims with old tires; a MBZ rims with old tires; a water cooler; a small refrigerator; a dynamometer (in ground); an evaporator machine next to smog machine; a big cooling fan; miscellaneous parts; parts cleaner (blue box); "used black hoses @ nozzles (on shelf);" a grinder; personal clothing and blue towels; books, a desktop computer located in the shop; an engine scope; a smog machine; a grease dispenser; oil; a mop bucket; o-rings and quarter pins (small plastic boxes); three drain pans; a parts cart; a battery water container; and an ERC tester with kit.

No witnesses testified regarding the current location or status of any assets at issue in the case.

### III. CONCLUSIONS OF LAW

### A.   Ownership of Assets

The threshold issue in this case is whether the Grewals had any personal ownership interest in the assets located at the gas station when the Grewals filed for Chapter 7 bankruptcy on October 18, 2010.  Only with such ownership interest can the Grewals prevail on the Grewals' claims that SCCB's refusal to return property to the Grewals violated either the automatic stay or the

19

subsequent discharge injunction in the Grewals' bankruptcy case.
If, however, those assets were owned by All American and not by the
Grewals, then the assets would not have become property of the
bankruptcy estate and there would be no violation.

### 1. The Smog Machine

The smog machine is the only asset that is named in both the
Grewals' schedule B and in the Amended Complaint. Mr. Grewal
testified throughout the trial that the smog machine was Mr.
Grewal's personal property, and not an asset of All American. Mr.
Grewal testified that when he attempted to sell All American
through Business Team, the sale was to be conducted with a split
escrow, distinguishing the All American assets from Mr. Grewal's
personal property assets. Mr. Grewal testified that the personal
property assets included the smog machine.

However, there was substantial evidence that the smog machine
was an asset of All American. First, Mr. Grewal testified that
from the date All American was formed, All American made all the
payments on the smog machine, and received all of the income from
its use. Mr. Grewal testified there was no agreement between All
American and Mr. Grewal for the use of the smog machine, and All
American did not pay Mr. Grewal rent or otherwise compensate Mr.
Grewal for its use.

Second, in 2007, All American purchased an EVAP machine, which
Mr. Grewal testified was necessary to do smog inspection and
repairs. It is not logical that if it had been Mr. Grewal's intent
to maintain the smog and repair work as a separate business, and to
use All American as a real estate holding device, that this
essential machine would be owned by All American rather than by Mr.

20

Grewal.

Third, the evidence demonstrated that SCCB believed that there was only one business operating, All American, and Mr. Grewal never spoke up and rectified the alleged misconception before SCCB approved the loan, or thereafter. The loan offer letter by SCCB to Mr. Grewal lists a UCC-1 filing on the "business" as collateral; it is clear that SCCB believed that there was only one business operating at the location, and intended to use it to secure the loan. This letter was delivered after Jorge Reguerin had inspected the business location; Mr. Reguerin testified that Mr. Grewal went over and explained each item in the letter to Mr. Grewal. Mr. Reguerin testified that when he met Mr. Grewal, Mr. Grewal did not tell Mr. Reguerin that Mr. Grewal owned any assets in his individual capacity. Mr. Grewal repeatedly testified that certain persons "knew" of the distinction between the smog business and All American, but when pressed to identify whom Mr. Grewal had told, Mr. Grewal admitted that Mr. Grewal had never informed SCCB of that distinction.

Fourth, Mr. Grewal's conduct in operating the business evidences that the only business was All American. Insurance was held solely in All American's name. Mr. Grewal's taxes do not evidence the existence of two separate businesses. Mr. Grewal testified that Mr. Grewal's accountant did not track income from the gas station, from the store, and from the mechanic's business, separately. Mr. Grewal claimed to be able to track this himself,

21

but this was not evident.[12]

Fifth, when All American was created, there was evidence that all of the assets of Grewal Shell were transferred to All American. Mr. Grewal testified that a complete transfer of these assets was not Mr. Grewal's intention. However, Mr. Grewal's accountant, Jayant Trivedi, testified that Mr. Trivedi did not recall any special instructions not to transfer all of the assets to All American. According to Mr. Trivedi, Mr. Trivedi only would have transferred all of the assets after consulting Mr. Grewal. If Mr. Grewal had intended to transfer less than all of the assets, Mr. Grewal did not communicate that intention to anyone.

Sixth, Mr. Grewal's testimony regarding the business structure of All American and the auto repair business was inconsistent. Mr. Grewal testified at one point that the auto-repair business was part of All American and Mr. Grewal worked there as an employee/owner, but also testified that the auto-repair business was not part of All American at all.

Finally, when Mr. Grewal attempted to sell the business, which Mr. Grewal testified included the assets at issue in this lawsuit, the sale documents signed and initialed by Mr. Grewal listed only All American, and made no reference to Mr. Grewal having any interest in any personal or business assets separate and apart from those of the corporation.

---

[12] Mr. Grewal's accounting raised some questions -- Mr. Grewal repeatedly claimed that because Mr. Grewal was the one performing the labor on a project, that entire amount was pure profit. However, Mr. Grewal failed to account for the underlying costs of operating the business -- for example, advertising, rent, utilities, and keeping the lights on.

SCCB reasonably thought that the smog machine was part of its collateral. SCCB's UCC-1 filing described SCCB's collateral as including a wide variety of items, including equipment. Mr. Grewal was silent about his secret intentions regarding the smog machine when transferring assets from Grewal Shell to All American, and did not inform SCCB that SCCB's collateral would exclude the smog machine. Mr. Grewal had several chances to correct any misconception by SCCB, but did not do so.

Given the above evidence, the Court finds and concludes that the smog machine was an asset of All American, not the Grewals. Therefore, SCCB's actions with regard to the smog machine could not violate either the automatic stay or the discharge injunction.

### 2. The Remaining Property

The Court was presented with little evidence regarding the ownership of the remaining assets in the Amended Complaint (i.e., the BMW engine on rollers, the BMW rims with old tires, the MBZ rims with old tires, the dynamometer, among other items discussed supra). Mr. Grewal testified that between the time when Mr. Grewal ceased operating a business at the Gilroy location and SCCB's foreclosure, Mr. Grewal was using the location to do work on automobiles on Mr. Grewal's own. Unfortunately, little to no evidence was presented regarding when the remaining assets were acquired, under what conditions, and for what purposes.

The Court's task has not been helped by the fact that neither party ever made an accounting or took pictures of the items within the shop. The allegations in the Amended Complaint -- which are not evidence -- were based on Mr. Grewal's memory, not a site inspection. Mr. Grewal testified that Mr. Grewal believed, as a

23

mechanic, that Mr. Grewal owned the tools as his personal property; this is bolstered by the fact that Mr. Grewal's employee, Roberto Martinez, appears to have kept Mr. Martinez's personal tools at the location (and SCCB allowed him to recover them without a problem). Based on Mr. Grewal's testimony, it is likely that Mr. Grewal personally owned some tools, but corroborative evidence of Mr. Grewal's personal ownership of specific tools was lacking.

The only specific evidence of ownership which the Grewals offered pertained to the water cooler and small refrigerator. Mr. Grewal testified that Mr. Grewal brought both the water cooler and small refrigerator from home for Mr. Grewal's personal use. This evidence was unrebutted. Therefore, the Court finds that the small refrigerator and water cooler were the personal property of Mr. Grewal when the bankruptcy petition was filed, and became property of the bankruptcy estate. Regarding the remaining items, there is insufficient evidence for the Court to determine ownership or that such property became property of the bankruptcy estate.

**B. Violation of the Stay or Discharge Injunction**

The only remaining question is whether SCCB's continued possession of the refrigerator and water cooler was a violation of the automatic stay or of the discharge injunction. The Grewals filed their bankruptcy petition on October 18, 2010, and received a discharge on January 19, 2011. SCCB's possession of the refrigerator and water cooler commenced prior to the filing of the petition, and is ongoing. This post-petition retention of the estate's property clearly violated the automatic stay, and possibly

24

also the discharge injunction.[13]  <u>State of California Employment and</u>
<u>Dev. Dept. v. Taxel (In re Del Mission Ltd.)</u>, 98 F.3d 1147, 1151
(9th Cir 1996).

The Grewals seek to recover damages for the stay violation.
In order for the Grewals to recover damages on this claim, the
Grewals must demonstrate, by a preponderance of the evidence,
"(1) that a bankruptcy petition was filed, (2) that the [debtors
are individuals], (3) that the creditor received notice of the
petition, (4) that the creditor's actions were in willful violation
of the stay, and (5) that the debtor[s] suffered damages."
<u>Bertuccio v. Cal. State Contractors  Lic. Board, (In re Bertuccio)</u>,
414 B.R. 611, 614 (Bankr. N.D. Cal. 2008), <u>aff'd</u>, 2011 WL 1158022
(N.D. Cal. Mar. 28, 2011), (<u>quoting</u> <u>In re Henry</u>, 328 B.R. 664, 667
(E.D.N.Y. 2005)); 11 U.S.C. § 362(k).  Neither the first or second
element was contested.

**1.   SCCB's Notice of the Grewals' Chapter 7 Petition**

SCCB attempted to argue that SCCB never received notice of the
Grewals' Chapter 7 petition.  The crux of this argument is that the
petition was served at a different address than the address
specified in the loan agreement between Mr. Grewal and SCCB.

However, SCCB, through its agent Ms. Crawford, received actual
notice of the bankruptcy petition.  Ms. Crawford testified that Ms.
Crawford saw, on or about November 4, 2010, a letter from the

---

[13] There is some question as to the applicability of the
discharge injunction because the property was not listed in the
Grewals' bankruptcy schedules, as discussed <u>infra</u>.  However, in
light of the clear violation of the automatic stay, it is
unnecessary to decide whether there was also a violation of the
discharge injunction.

Case: 11-05067   Doc# 88   Filed: 09/30/13   Entered: 09/30/13 15:48:48   Page 25 of
31

Grewals' attorney to SCCB dated November 4, 2010; that letter clearly stated that Mr. Grewal had filed for Chapter 7 bankruptcy on October 18, 2010, and included the case number. Ms. Crawford further testified Ms. Crawford had seen, on or about December 16, 2010, another letter sent from the Grewals' attorney to SCCB, which clearly references the Grewals' status as Chapter 7 debtors, including a case number.

Therefore, the Court finds that SCCB, at least by November 4, 2010, and certainly no later than December 16, 2010, had actual notice of the Grewals' petition. The fact that notice of the bankruptcy was mailed to an address other than that stated in the loan agreement is of no importance.

Importantly, SCCB also had notice that the refrigerator and water cooler were estate property. The Grewals had informed the SCCB in pre- and post-petition correspondence that these two items were the Grewals' personal property.

### 2. Willfulness of the Violation

In order to violate the automatic stay, a creditor's actions must be willful. <u>Bertuccio</u>, 414 B.R. at 614. A violation is willful if a party knew of the automatic stay, and its actions in violation of the stay were intentional. <u>Pinkstaff v. United States (In re Pinkstaff)</u>, 974 F.2d 113, 115 (9th Cir. 1992). "To effectuate the purpose of the automatic stay, the onus to return estate property is placed upon the possessor; it does not fall on the debtor to pursue the possessor." <u>Taxel</u>, 98 F.3d at 1151.

In the instant case, SCCB did not return the refrigerator or the water cooler, changed the locks on the property to prevent the Grewals from recovering either of these items, and, absent a single

26

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

meeting that ended unsuccessfully, did not make any attempts to return these items to the Grewals or to the Chapter 7 Trustee. SCCB's continued possession of these two items was intentional, and thus a willful violation of the stay.[14]

### 3. Damages

The Grewals have established that they -- and the bankruptcy estate -- have been deprived of the refrigerator and water cooler, but that is all. The Grewals have not established that SCCB's continued retention of the refrigerator and water cooler resulted in any other damages to the Grewals or to the bankruptcy estate. The Grewals made no attempt to quantify their loss at trial.

Interestingly, both the refrigerator and water cooler are unadministered assets of the bankruptcy estate. Neither the refrigerator nor the water cooler were listed in the Grewals' bankruptcy schedules as personal property or as exempt. Mr. Grewal testified that both the refrigerator and water cooler were subsumed within the entry in Schedule B for "Automotive equipment including wheel balancer and smog machine." This assertion stretches credulity -- a refrigerator and water cooler are clearly not automotive equipment -- but even if the Court were to assume that these two items were encompassed within this category, it would mean that both items had little or no value. This is because the asserted value of the smog machine, alone, was $18,000, minus anticipated repair costs of $3,200. If so, then the entire $4,000

---

[14] As discussed _supra_, the Court did not find Ms. Crawford's testimony to be entirely reliable or credible on the subject of whether Mr. Grewal was allowed to take -- or actually took -- items from the property during the November 10, 2010 meeting between Mr. Grewal, his son Gurgas, Roberto Martinez, and Ms. Crawford.

Case: 11-05067   Doc# 88   Filed: 09/30/13   Entered: 09/30/13 15:48:48   Page 27 of 31

would be subsumed by the smog machine, leaving no value to assign to anything else.

In any event, the Court concludes that the entry for "Automotive equipment including wheel balancer and smog machine" was insufficient to encompass a water cooler or refrigerator. Indeed, Mr. Grewal's testimony is to the contrary -- the refrigerator and water cooler were for Mr. Grewal's personal use. Therefore, these unscheduled assets -- which have never been abandoned to the Grewals -- remain unadministered assets of the bankruptcy estate. The Chapter 7 Trustee would be entitled to liquidate both items for purposes of making payments to creditors, or the Chapter 7 Trustee could elect to abandon these items to the Grewals under 11 U.S.C. § 554 if the items have inconsequential value or benefit to the estate. If the latter, then the Court cannot say that these items have any value, now.

In addition, the Grewals presented no evidence of the value -- fair market or otherwise -- of the refrigerator or the water cooler, or how the Grewals (or the bankruptcy estate) were damaged by the deprivation of these items. Because neither asset appears on the Grewals schedules, the Court cannot reference the schedules to ascertain damages. Therefore, the Grewals have not established that they are entitled to an award of damages for the stay violation. However, the Court will order SCCB to turn over the refrigerator and water cooler to the Chapter 7 Trustee for administration or abandonment to the Grewals.

### 4. Attorney's Fees

The Grewals have requested an award of attorney's fees in this case. The recoverability of attorney's fees for a stay violation

28

1  was addressed and limited by the Ninth Circuit in <u>Sternberg v.</u>

2  <u>Johnston</u>, 595 F.3d 937 (9th Cir. 2010).  The Grewals may not

3  recover fees incurred in pursuing an award of damages.  Instead,

4  the Grewals can only recover fees incurred in seeking the return of

5  the refrigerator and the water cooler.

6      The claims asserted in the Amended Complaint primarily seek an

7  award of damages, not the return of any property.  The bulk of this

8  litigation has also been aimed at recovering an award of damages,

9  not at recovering any property for the Grewals or their bankruptcy

10  estate.  To this extent, the Grewals are not entitled to an award

11  of attorney's fees.

12      However, the Amended Complaint prays for the restoration of

13  any property seized in violation of the automatic stay.  Pursuant

14  to the preliminary injunction entered on April 26, 2011, SCCB

15  should continue to have possession of the water cooler and

16  refrigerator.  Although these two items must be returned to the

17  Chapter 7 Trustee for administration, the Grewals have not

18  demonstrated what attorney's fees they incurred with regard to this

19  narrow piece of the litigation.

20

21                          **IV. CONCLUSION**

22      The Court finds that the Grewals have proven a violation of

23  the automatic stay, but only with respect to SCCB's post-petition

24  retention of the water cooler and small refrigerator.  Within 10

25  days of this Order, the SCCB shall turn these two items over to the

26  Chapter 7 Trustee.  However, the Grewals have proven no damages

27  resulting from the stay violation, and have not established what,

28  if any, attorney's fees they incurred in seeking the return of the

refrigerator or water cooler.  Therefore, no damages or attorney's fees are awarded.

　　　　IT IS SO ORDERED.

　　　　　　　　*** End of Memorandum Decision and Order ***

Case: 11-05067   Doc# 88   Filed: 09/30/13   Entered: 09/30/13 15:48:48   Page 30 of
31

**<u>COURT SERVICE LIST</u>**

\*\*All parties served electronically by ECF

Case: 11-05067   Doc# 88   Filed: 09/30/13   Entered: 09/30/13 15:48:48   Page 31 of 31